UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY CZERNESKI,

        Plaintiff,

                                          Case No. 12-cv-12417

v.

                                          Paul D. Borman

AMERICAN BLUE RIBBON             United States District Judge
HOLDINGS, LLC,

        Defendant.

_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 21)**

       This action arises from Plaintiff Kelly Czerneski's[1] allegations of gender discrimination

while working as a manager at Max & Erma's Restaurant in Birmingham, Michigan.  On June 4,

2012, Plaintiff filed her complaint asserting "gender discrimination" pursuant to Title VII, 42

U.S.C. § 2002, *et seq*., and Michigan's Elliot-Larsen Civil Rights Act, MICH. COMP. LAWS §

37.2101, *et seq*.  (Dkt. No. 1).

       Now before the Court is Defendant American Blue Ribbon Holdings, LLC's (then

operator of Max & Erma's Restaurants) motion for summary judgment filed on July 1, 2013.

(Dkt. No. 21).  Plaintiff responded to the motion on August 15, 2013.  (Dkt. No. 33).  Thereafter,

Defendant filed its reply.  (Dkt. No. 37).  A hearing on this matter was held on February 27,

2014.

---

     [1] Since the filing of this action, Plaintiff has married and legally changed her name to
Kelly Czerneski.  The Court will refer to her by this name.

# I. BACKGROUND

Plaintiff Kelly Czerneski ("Plaintiff") began working for Max & Erma's restaurant in 2006. In February 2010, she became the General Manager at the Birmingham, Michigan location ("Birmingham store"). (Def.'s Br., Ex. B, Pl.'s Dep. at 49, 51).[2]

Defendant American Blue Ribbon Holdings, LLC ("ABRH") owns and operates multiple restaurants and restaurant chains across the United States. On September 1, 2010, ABRH purchased multiple Max & Erma's restaurants out of bankruptcy in an assent transaction. (Ex. G, Whitehurst Dep. at 10). This purchase included the Birmingham store where Plaintiff was employed. (*Id*.). After the purchase, Plaintiff kept her position as general manager. (Pl.'s Dep. at 53, 6; Compl. at ¶ 10). As general manager, Plaintiff was in charge of the restaurant's day-to-day operations and reported to a regional manager. (Pl.'s Dep. at 156-58; Adams Dep. at 25; Ex. C, Adams Decl. at ¶ 2). Ryan Vann was the regional manager who supervised Plaintiff until approximately March 19, 2011, when Christopher Adams became the regional manager. (Adams Dep. at 25; Adams Decl. at ¶ 2; Ex. F, Williams Dep. at 22, 25). As regional manager, Adams was responsible for seven Max & Erma's locations in southeast Michigan including the Birmingham store. (Ex. D, Adams Dep. at 8, 13-14). Between January 2011 and December 2011, Adams supervised six male general managers and only one female general manager - Plaintiff. (*See* Pl.'s Ex. 11, Def.'s Answers to Interrogatories at 8).

## A.    Plaintiff's Performance History and Personnel File

In the many years of Plaintiff's employment at Max & Erma's, she only received one

---

[2] Both parties have submitted almost identical exhibits to their briefs. For ease of reference the Court will refer to the exhibits attached to Defendant's brief unless indicated otherwise.

performance evaluation which covered the time period of September 1, 2010 until March 1, 2011.  (Pl.'s Br., Ex. 6, Performance Evaluation).  The performance evaluation noted that Plaintiff's overall rating of performance was "satisfactory" which indicated that her "performance consistently meets standards, objectives, and/or expectations; may exceed several or may miss several.  Overall performance is satisfactory."  (*Id*. at 1).

Adams testified that he had only been regional manager for a week at the time he met with Plaintiff regarding her performance evaluation and he "didn't have much to go on for comments."  (Adams Dep. at 54:18).  Adams also explained that "[e]veryone received satisfactory [reviews] because I didn't want to go in there without prior knowledge of dealing with these people."  (*Id*.).   Adams explained that Ryan Vann had produced the management performance section of the evaluation and he "just went over the objectives, the performance goals, things we needed to work on ...".  (Adams Dep. at 54).  In the performance goals section of the review, there were a number of items listed for Plaintiff to work on and also the projected date for the items to be addressed.  (Ex. 6, at 7-8).  The earliest date listed for these items to be addressed was May 18, 2011.  (*Id*.).  Adams and Plaintiff filled out the performance goals section of the evaluation together, while Adams indicated that he completed the regional manager comments section himself.   (*Id*. at 56, 60).

The regional manager comments section stated: "Cleanliness and Sanitation are the most important initiatives right now.  To me if we can't set up the basics to keep our restaurants clean and safe than we can't move forward and attack the sales piece.  People is the next initiative, staff and training the right people for the job.  After we create an environment based on our [vision, value and culture] and get great at the Staffing, Training, Sanitation and Cleanliness

sales then profit will just happen."  (Ex. 6, at 10).

Meredith Williams, a regional human resource manager, testified that Plaintiff's personnel file does not contain any documentation of warnings or discipline from Adams or any other supervisor.  (Williams Dep. at 92).  However, Meredith Williams testified that Adams had talked to her regarding the cleanliness and staffing problems with the Birmingham store in early 2011 in the context of discussing Plaintiff's performance issues and represented to her that he was verbally coaching Plaintiff regarding these issues.  (Williams Dep. 46-48, 58-59).

**B.      Birmingham Store visit on March 17, 2011**

Plaintiff testified that when she took over the general manager position in February 2010, the Birmingham store was a "disgusting disaster" and that it had not been profitable in many years.  (Pl.'s Dep. at 53, 62, 65:13).

On March 17, 2011, around the time Adams officially became the regional manager, Adams, Jeff Neely, the president of Max & Erma's, and Ryan Vann visited the Birmingham store.  (Pl.'s Dep. at 74, 77, 117; Adams Dep. at 19-20).  This was the first time Adams had met Plaintiff.  (Adams Dep. at 19).  Plaintiff described the purpose of the visit as a chance for Neely to "let us know what he thought our stores needed work on."  (Pl.'s Dep. at 121:3-4).  Plaintiff informed Neely, Vann and Adams that she believed her store was the most organized and one of the cleanest and was very proud to show Neely how much she had accomplished.  (*Id*. at 121).

Adams disagreed with Plaintiff's assessment of the visit and described Neely as disappointed in the visit.  (Adams Dep. at 20). Adams also testified that Neely stayed and spoke with Plaintiff for 15 or 20 minutes in private regarding the fact that he "wanted to get her head straight that she wasn't where she needed to be cleanliness-wise and, you know, the ideal was

4

hospital clean." (*Id*. at 20:21-23). Plaintiff confirmed this discussion only in part, stating that she and Neely had a private discussion during the visit in which they discussed that the new owners had "different expectations than what we previously had" and "[Neely] went through – how everything – how he wanted it to look ... I mean, we had already heard how they wanted it hospital clean." (Pl.'s Dep. at 122-123).

At some point during this visit, Plaintiff alleges that she and Adams went outside the restaurant to view a potential patio area. (Pl. Dep. at 67-68). While in front of the building, Plaintiff alleges that Adams, while "two inches" from her face, put his hand on her shoulder and stated, "How would you like it if I moved in across the street, and then I could keep an eye on you every day?" (*Id*. at 68:5-7, 71:20). Plaintiff explained that she stated, no, she would not like that and immediately stepped away from him. (*Id*. at 68-69). Plaintiff explained that she understood Adams' comment to be sexually suggestive. (*See* Pl.'s Dep. at 74:18-19, "I've been hit on before and I know exactly what that means ..."). Adams disputes that he ever made this comment, but agreed that if it had been made it would be inappropriate. (Adams Dep. at 23-24). Plaintiff also alleges that it was "very unprofessional" of Adams to consistently choose to sit next to her in a booth rather than across from her while having work meetings. (Pl.'s Dep. at 67).

Immediately after Adams made the comment regarding moving in across the street to Plaintiff, Plaintiff requested a week of vacation because she was upset about the encounter although she gave Adams some other reason for needing the time off. (Pl.'s Dep. at 99). Adams confirmed that Plaintiff requested a week of around March 21, 2011 for alleged personal issues. (Adams Dep. at 24; Adams Decl. ¶ 3).

Plaintiff testified that the day after she returned from her vacation, Adams met with her at the Birmingham store and informed her that he had hired his friend, a male, and that "he was currently being trained to take my position." (Pl.'s Dep. at 126:13-14). Plaintiff testified that Adams told her his friend's name (which she believes may have been Shawn) and that the friend became the general manager at the Auburn Hills location. (*Id*. at 126). Adams disputes that this statement was made and testified that he advised Plaintiff that he had hired two people who were previous managers for him for open positions with the company. (Adams Dep. at 76).

**C.      Adams' verbal counseling**

Plaintiff disputes that Adams ever verbally coached or counseled her regarding the cleanliness of the restaurant. Plaintiff testified that she and Adams talked about staffing issues and the cleanliness of the store and that "he was basically bringing down everything that the owners wanted in all the stores." (Pl.'s Dep. at 209). However, Plaintiff disputes that Adams ever insinuated that her store was "bad" regarding those issues. (*Id*. at 209:12).

Adams testified that he visited the Birmingham store on a weekly basis and observed problems with the cleanliness of the store and inadequate staffing. (Adams Decl. ¶ 4; Adams Dep. at 36). Adams testified that he verbally counseled Plaintiff on these operational issues because he believed that verbal coaching would be more effective than formally documenting the issues because he wanted to give her the benefit of the doubt and believed that documenting the issues could be offensive. (Adams Dep. at 42; Adams Decl. ¶ 4). Thus, there was no paper trial evidencing Defendant's concerns regarding Plaintiff's job performance.

On April 22, 2011, Plaintiff took time off because she had burned herself attempting to clean the walls of the restaurant with a steamer she had brought from home. (Adam Decl. ¶ 6;

Adams Dep. at 24).  Adams testified that after she returned from her time off, he informed her

that the Birmingham store "was going down fast" and that her job would be in jeopardy if she

did not address or fix the issues.  (Adams Decl. ¶ 6, Adams Dep. at 61-62, 77).  Adams testified

that he was frustrated at that time because the store was not clean, still having staffing issues,

and he had seen cockroaches in the building.  (Adams Dep. at 62, 65).

**D.   Management visit May 5, 2011**

In early May 2011, the ARBH's principal corporate executives visited the Max & Erma's

Michigan restaurants that ARBH had purchased out of bankruptcy.  The visiting executive team

included: Hazem Ouf, CEO, Monty Whitehurst, then acting Vice President of Operations, and

Jeff Amber, Max & Erma's Executive Chef.  (Pl.'s Dep. at 135-36; Adams Dep. at 45;

Whitehurst Dep. at 38, 45).  Locals Ryan Vann and Adams were also scheduled to visit the

restaurants with the executive team.  (Adams Dep. at 45).  It was Ouf and Whitehurst's first visit

to the Michigan locations.  (Whitehurst Dep. at 43-45).

The Michigan executives were aware in advance of the executives' Michigan visit.

(Whitehurst Dep. at 41; Ex. O, Giles Dep. at 42).  Adams told Plaintiff of the impending store

visit, although he testified that he did not know the exact date or time.  (Adams Dep. 46; Giles

Dep. at 35, 42; Pl.'s Dep. at 135).  Whitehurst testified to the contrary, stating that Adams and

Vann were aware of which day the executives were visiting (Adams' locations would be visited

on Thursday, May 5, 2011 and Vann's locations would be visited Friday, May 6, 2011), and also

were aware of the order the locations would be visited on each day.  (Whitehurst Dep. at 41).

Whitehurst testified that he would have expected the regional managers convey the schedule to

their locations.  (*Id.*).

7

On May 4, 2011, Plaintiff attended a corporate management seminar and dinner for all of Max & Erma's general managers at a local hotel. (Pl.'s Dep. at 163-64). Near the end of dinner she learned that all of the other general managers were aware of when the executives were visiting their location and that time that the executives were scheduled to visit her store early the next day, May 5, 2011. (*Id*.).

Plaintiff had worked Tuesday, May 3 and the morning of Wednesday, May 4 before leaving for the general managers' seminar. (Pl.'s Dep. at 137-38). Plaintiff was not scheduled to work on Thursday, May 5, 2011, because she had an important court date regarding the custody of her children, which had already been rescheduled once. (Pl.'s Dep. at 141). There was a checklist of items that Plaintiff had indicated all of the tasks that needed to be accomplished before the executive visit. (Pl.'s Dep. at 136; Giles Dep. at 54). Plaintiff felt the checklist had been completed. (Pl.'s Dep. at 136-38).

Adams was aware of Plaintiff's schedule, and that she would not be at the store on May 5, 2011. (Adams Dep. at 49). Rob Ward, a manager in training, was scheduled to close on May 4, 2010. (Pl.'s Dep. at 139). Dan Giles, an assistant manager, was scheduled to open the morning of the executive visit. (*Id*. at 50, 139).

When Plaintiff discovered the executive visit was scheduled for the next morning, she texted Giles to alert him. (Giles Dep. at 40). Giles also called Rob Ward to warn him of the impending visit. (*Id*. at 53-54).

The executives arrived at the Birmingham store before it opened for lunch around 10:45 a.m. on May, 5, 2011. (Whitehurst Dep. at 47). Adams was delayed and was not with the executives upon their arrival. (*Id*. at 51). Whitehurst testified that the store was clearly not

8

ready to open because the lights were not on in the dining room, the chairs were still stacked on the tables and a few people were wandering around aimlessly. (*Id*. at 46-47). Further, in the back room frozen and chilled goods were stacked everywhere from a recent delivery. (*Id*.). Nothing had been done to set up for lunch service. (*Id*.). Whitehurst also explained that there was a staffing deficiency in the front and the back of the house as well as "stench" emanating from behind the bar that "didn't happen overnight." (*Id*. at 53, 59, 60:8-9). Also, some food products were discovered to be one or more days out of date. (*Id*. at 60).

Whitehurst observed Giles leave his office after completing the inventory and speak with CEO Ouf. (*Id*. at 48, 50). Whitehurst testified that he heard Giles explaining to CEO Ouf that two cooks had called in to be "off" Thursday and that "time had just gotten away from him". (*Id*. at 50:13). At that point the visiting executives all pitched in to set up the restaurant for lunch service. (*Id*. at 51, 54). Giles testified that the restaurant was "dirty" and described the visit as embarrassing. (Giles Dep. at 53, 62).

Plaintiff testified that when her court hearing concluded around lunch time, she had missed a call from Adams. (Pl.'s Dep. at 143). She returned his call and was surprised to learn that the executive visit had not gone well. (*Id*. at 144-145). She was told to come in the next day for a meeting with Adams. (*Id*.). Plaintiff testified that the executive visit "was, I guess, horrible. I don't really know. I wasn't there, but things were not set up to be that way." (*Id*. at 145:8-11).

Adams was embarrassed by the Birmingham store executive visit. (Adams Decl. ¶7). Adams was also informed by CEO Ouf of his disappointed in the Birmingham store, and that Adams needed to come up with a plan to improve the restaurant with a new general manager.

(*Id.*; Adams Dep. at 80, 84).

**E.     Suspension and Termination**

Adams contacted Williams after the Birmingham store visit and discussed Plaintiff and

"the next steps".  (Williams Dep. at 78; Adams Dep. at 71).  Williams drafted the separation

notice for Plaintiff; she received all of the information for the notice from Adams.  (Williams

Dep. at 78).  Adams and Whitehurst had also had a phone call that night regarding the

Birmingham visit, although not specifically about Plaintiff, but rather the general lack of

cleanliness, food safety concerns, staffing levels and lack of training.  (Whitehurst Dep. at 56-

57).  Williams testified that she reviewed the violations charged in the suspension notice with

Whitehurst and Adams.  (Williams Dep. at 81).  Williams also received a call from Ouf over that

weekend in which he indicated that as a result of what he witnessed during the executives' visit

"he believed that the only proper course of action for [ABRH] to take was for Plaintiff's

employment to be terminated."  (Williams Decl. at ¶ 3).  Both Whitehurst and Adams testified

that it was ultimately Adams' decision to terminate Plaintiff.  (Adams Dep. at 81; Whitehurst

Dep. at 63).

Plaintiff was given a suspension notice on May 6, 2011 when she appeared for work.

(*See* Ex. H, Suspension Notice).  The notice cited multiple reasons for her suspension including:

failure to uphold food safety procedures by keeping products past their expiration date; failure to

meet staffing levels; failure to meet the job expectations of a general manager; "severe

cleanliness issues"; failure to manage the cost of running the business; allowing staffing levels to

"run dangerously low", and, finally, that the equipment in the building "is not being cleaned

properly and [is] now is in severe disrepair."  (*Id.*).

On May 10, 2011, Plaintiff met with Adams and was terminated for the same reasons set forth in her separation notice.  (*See* Ex. H, Termination Notice (incorporating reasons set forth in Separation Notice)).

**F.    Post Termination Events**

Plaintiff filed a charge of discrimination with the EEOC and the Michigan Department of Civil Rights on June 30, 2011. (Def. Br. Ex. J).

Adams filled in for Plaintiff after she was terminated for a few weeks. (Adams Dep. at 75).  Eventually, Andy Long was transferred from the Auburn Hills location to take Plaintiff's position as general manager at the Birmingham store.  (Adams Dep. at 75; Whitehurst Dep. at 70).  Adams testified that he did not know Andy Long prior to working for Max and Erma's. (Adams Dep. at 76).  It was Adams' decision to transfer Andy Long to the Birmingham store. (Whitehurst Dep. at 70).  In August, 2011, Andy Long was transferred to another location and Dan Giles was promoted to general manager of the Birmingham store.  (Giles Dep. 56-57). There was no improvement in business at the Birmingham store from May 2011 until January 2013.  (Whitehurst Dep. at 75; Adams Dep. at 85).  In January 2013, the Birmingham location was closed.  (*Id*.).

## II. STANDARD OF REVIEW

Defendant has moved for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate where the moving party demonstrates that there is no

11

genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere

12

allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in

Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

FED. R. CIV. P. 56(e).  The rule requires that non-moving party to introduce "evidence of

evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd.

of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-

moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

Defendant has addressed Plaintiff's claims for gender discrimination as well as sexual

harassment under Title VII and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA").  Plaintiff

does not address or respond to any argument regarding a claim for sexual harassment and stated

at the hearing that she is only pursuing a claim of gender discrimination pursuant to the statutes.

Therefore, the Court will not address a sexual harassment issue.

### A.    Gender Discrimination

Plaintiff claims that ARBH violated Title VII and ELCRA by wrongfully terminating her

employment because of her gender.  Pursuant to Title VII's anti-discrimination provision, "it is

"an unlawful employment practice for an employer . . . to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  *White v. Baxter Healthcare

Corp.*, 533 F.3d 381, 390 (quoting 42 U.S.C. § 2000e-2(a)(1)).  Similarly, the ELCRA "provides

that '[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise

discriminate against an individual with respect to employment compensation, or a term,

condition or privilege of employment, because of religion, race, color, national origin, age, sex,

height, weight, or marital status."  *Id.* at 390-91 (quoting MICH. COMP. LAWS 37.2202(1)(a)).

The Court notes that Michigan courts often turn to federal law when interpreting Michigan's anti-discrimination statutes, and therefore the Court relies upon the Title VII standards for both the federal and state claims asserted by Plaintiff.  *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir. 1999).

Pursuant to Title VII and ELCRA, a plaintiff may show discrimination either by showing direct evidence of discrimination or by showing indirect or circumstantial evidence of discrimination.  If a plaintiff cannot offer any direct evidence of discrimination, the plaintiff can establish discrimination using the familiar *McDonnell-Douglas* burden shifting framework.  *See Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

### 1.    Indirect Evidence of Gender Discrimination

Plaintiff and Defendant dispute whether Adams' alleged comment that he was training a male friend to replace Plaintiff is "direct evidence" of gender discrimination.  However, the Court need not resolve the issues of whether this evidence rises to the level of "direct evidence" because it is clear that Plaintiff has established a prima facie case of gender discrimination.

To establish a prima facie case of gender discrimination, a plaintiff must show that: "(1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or similarly situated non-protected employees were treated more favorably."  *Grace*, 521 F.3d at 677.  After a plaintiff has carried her burden in establishing a prima facie case of discrimination, "then the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge."  *Id*. (citing *McDonnell Douglas*, 411 U.S. at 802).  If the defendant can demonstrate a legitimate reason for the discharge then the burden

14

reverts to the plaintiff to set forth that defendant's proffered reason is mere pretext for discrimination. *Grace*, 521 F.3d at 677 (citing *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). However, the "burden of persuasion" remains on the plaintiff at all times. *Grace*, 521 F.3d at 677 (citation omitted).

In the present action, Plaintiff has set forth a prima facie case as to the first two factors, there is no dispute that Plaintiff is a woman and therefore a member of a protected class, and that she was terminated by Defendant. (*See Grace*, 521 F.3d at 677, noting that discharge is a class example of an adverse employment action). As to the third factor, there is also sufficient evidence on the record that Plaintiff was qualified for her position per Defendant's evaluation (dated a little more than one month prior to her discharge) that rated her performance as "satisfactory". Finally, as to the fourth factor, the evidence establishes that Defendant replaced Plaintiff with Andy Long, who is a male.

As Plaintiff has established a prima facie case, the burden shifts back to Defendant who must offer a legitimate, nondiscriminatory reason for Plaintiff's discharge. To this end, Defendant contends that it has proffered a legitimate and nondiscriminatory reason for Plaintiff's termination - namely the reasons articulated in her suspension notice and restated by reference in her separation notice.

## B.    Pretext

Defendant claims that it has legitimate and nondiscriminatory reasons for terminating Plaintiff. Specifically, Defendant contends that Adams fired Plaintiff for the following reasons (as stated in her Suspension Notice): failure to uphold food safety procedures by keeping products past their expiration date; failure to meeting staffing levels; failure to meet the job expectations of a general manager; "severe cleanliness issues"; failure to manage the cost of

15

running the business; allowing staffing levels to "run dangerously low", and that the equipment in the building "is not being cleaned properly and now is in severe disrepair." (*See* Suspension Notice). The suspension notice also provided that Plaintiff was "coached and counseled on the company's expectations and standards on several prior occasions". (*Id.*).

Defendant's proffer of legitimate and nondiscriminatory reasons for Plaintiff's termination shifts the burden back to Plaintiff to show that these reasons are merely a pretext for gender discrimination. A plaintiff can demonstrate the proffered reason by the employer is pretext by establishing the given reason: (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

### 1.      No Basis in Fact

Viewing the record in a light most favorable to Plaintiff, the Court finds that she has raised a triable issue of fact regarding whether Defendant's stated reasons for her termination were mere pretext for discrimination because Plaintiff has evidenced that many of the enumerated reasons for her termination may have no basis in fact.

First, Plaintiff testified that she was never verbally coached or counseled by Adams regarding the cleanliness or operations of her store as Adams represents. Indeed, Plaintiff notes that her personnel file fails to corroborate any reprimand or instance of coaching. The Court finds that this is significant as it is unlikely there would be no evidence of the persistent and pervasive "cleanliness" issues Defendant alleges (i.e., vermin, horrible smells and expired food). Therefore, this raises a genuine issue of fact regarding truth of her suspension notice which states Plaintiff had recently been coached and counseled regarding "cleanliness, staffing and following

16

food specifications".  (Suspension Notice).

Further, the Court finds that Plaintiff also raises issues of fact regarding two other cited reasons for her suspension and termination: that the restaurant was not profitable and that the restaurant equipment was in disrepair.  Plaintiff has testified that the Birmingham store was not profitable when she became general manager and offered evidence that the location remained unprofitable after she was terminated.  (Pl.'s Ex. 9, Financial Records).  Further, Plaintiff testifies that much of the equipment in the Birmingham location was recently replaced so it cannot be said that it was "in disrepair" on May 5 during the executive visit.  (Pl.'s Dep. at 175; *see also* Pl.'s Ex. 10, Health Department Records at 32, indicating that new equipment was installed and other new equipment purchased and to arrive by March 25, 2011).  Finally, the Oakland County Health Department records (which document an inspection in early March, 2011) raise a material issue of fact regarding Defendant's allegation that the Birmingham store had "severe cleanliness issues" and food safety violations as those documents fail to reveal such systemic cleanliness failures, smells or vermin.  (*See* Health Department Records at 1- 33). [3]

Finally, the Court finds that Plaintiff's allegation that Adams told her that he was training a male friend to take her position in late April 2011 and that Plaintiff was replaced by a male supports an inference that her termination was motivated by her gender.  Importantly, there is no dispute that the ultimate decision to terminate Plaintiff was Adams' decision.  Further, Adams had allegedly made the comment that he planned on replacing her with a male friend less than two months before she was terminated and replaced with Andy Long.

---

[3] Indeed, the Health Department records also document the equivalent violations and more severe infractions occurring after Plaintiff was fired.  (*See* Health Department Records at 34-67, i.e. inspection date 10/2/12, at 57, noting a can of pesticide in the bar area; inspection date 10/16/12, at 63, noting "black mold-like substance" in the ice machine).

While Defendant argues that no gender inference can be made from the alleged comment that Adam was training "his friend" to replace Plaintiff, it is clear from Plaintiff's testimony that Adams apprised her of the fact that his friend was, in fact, a man during their conversation. (Pl.'s Dep. at 126, testifying that Adams gave his name and that Adams advised her that "he was currently being trained to take my position."). This comment raises a genuine issue of material fact regarding whether Adams' motivation to terminate Plaintiff was based on her gender. Therefore, viewing the record in the light most favorable to Plaintiff, the Court rejects Defendant's argument that the comment is gender neutral.

## 2.  **Disparate Treatment**

To the extent Plaintiff argues that the Court should find that Defendant's disparate treatment of tow male employees at the Birmingham location, Giles and Ward, is evidence of pretext, this claim is without merit because neither was the general store manager at the time Plaintiff was terminated. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (an employee can demonstrate "pretext by producing evidence that other employees . . . not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.") (internal quotation marks omitted). Giles and Ward, both male, were both actually involved in the opening and closing of the restaurant before the executive visit. Neither Ward nor Giles were terminated or even reprimanded for the poor showing during the executive visit. In fact, Giles was eventually promoted to general manager of the Birmingham store in August 2011. The Court finds that Giles and Ward were not "similarly situated" to Plaintiff because both men held lower echelon positions than Plaintiff. Giles was an assistant manager and Ward was merely a manager in training. (*See* Pl.'s Dep. at 139, 140). Therefore, Plaintiff's situation was not comparable to that

18

of Giles and Ward.

### 3.    Honest Belief Rule

Defendant argues that even if Plaintiff raises a triable issue of fact regarding the

pretextual nature of its reasons for termination, her claim still fails because Adams had an

"honest belief" that Plaintiff should be terminated for her unsatisfactory performance as

demonstrated by the condition of the restaurant during the executive visit on May 5, 2011.  The

United States Sixth Circuit Court of Appeals has adopted an "honest belief" rule with regard to

an employer's proffered reason for discharging an employee.  *Majewski v. Automatic Data*

*Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp*., 155 F.3d

799, 806-07 (6th Cir. 1998)).

> Under this rule, as long as an employer has an honest belief in its proffered
> nondiscriminatory reason for discharging an employee, the employee cannot
> establish that the reason was pretextual simply because it is ultimately shown to
> be incorrect.  An employer has an honest belief in its reason for discharging an
> employee where the employer reasonably relied "on the particularized facts that
> were before it at the time the decision was made."

*Id*. (quoting *Smith*, 155 F.3d at 807).  "The key inquiry in assessing whether an employer holds

such an honest belief is 'whether the employer made a reasonably informed and considered

decision before taking' the complained-of action.'"  *Michael v. Caterpillar Fin. Serv. Corp*., 496

F.3d 584, 589-99 (6th Cir. 2007) (citation omitted).

In *Majewski*, the plaintiff attempted to meet his burden in showing pretext by producing

evidence that the proffered reason for discharge, that his job performance was unsatisfactory,

was false.  *Id*. at 1116-17.  Similar to the instant case, the plaintiff in *Majewski* argued that the

defendant's reasons were pretextual and that his performance was actually satisfactory.  *Id*.

However, in relying upon the "honest belief rule" the Sixth Circuit held that "Majewski's

19

disagreement with [the defendant's] honest business judgment regarding his work does not create sufficient evidence of pretext in the face of the substantial evidence that [the defendant] had a reasonable basis to be dissatisfied." *Id*. at 1116. The Sixth Circuit noted that there was evidence that supported the nondiscriminatory reason for discharge including evidence of his declining performance over years and the investigation into the complaints of his deficiencies. *Id*. at 1117.

In the present case, Plaintiff sets forth a multitude of reasons why she should not be held responsible for the state of the Birmingham store when the executives visited, chief among them that she was not present during the visit and did not close the store the night before or open it that morning. More persuasive, however, is the fact that Plaintiff has set forth evidence which raises genuine issues of material fact regarding the truth of the enumerated reasons why she was suspended and then ultimately terminated. Further, the written record is utterly silent regarding any issues (cleanliness or otherwise) with Plaintiff's performance as a general manager for the Birmingham store that predate May 5, 2011.

Unlike the facts in *Majewski*, where there was documentation and corroboration of the plaintiff's failing performance over a number of years, here there is no written evidence of Plaintiff's alleged prior poor performance, or of any counseling regarding the operation of the Birmingham store as alleged by Adams. Further, any testimony regarding Plaintiff's alleged shortcomings as a general manager outside of the executive visit on May 5, 2011, come from Adams, the supervisor that Plaintiff alleges had informed her that he planned on replacing her with his male friend. As stated *supra* the key inquiry into whether an employer has an "honest belief" is whether the employer made a "reasonably informed and considered decision" before terminating the employee. *See Michael*, 496 F.3d at 589-99 (citation omitted). In the instant

20

case, a reasonably informed and considered decision cannot be found where there is no documentation or corroboration of Plaintiff's alleged repeated shortcomings or evidence of persistent cleanliness issues in the Birmingham store.  To the contrary, the only documentary evidence regarding Plaintiff's historical performance belies Defendant's allegations and indicates Plaintiff's performance was satisfactory.

Viewing the record in the light most favorable to Plaintiff, she has established a genuine issue of material fact regarding whether the enumerated reasons articulated in the suspension notice and referenced in her termination notice have a basis in fact.  Hence, the Court finds that Defendant cannot establish it had an "honest belief" regarding its reasons for terminating Plaintiff.

Therefore, the Court finds that Plaintiff has established a triable issue of material fact regarding whether Defendant's reasons for termination were merely pretext for gender discrimination and summary judgment is inappropriate.

## IV. CONCLUSION

For all these reasons the Court DENIES Defendant's Motion for Summary Judgment. SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 20, 2014

21

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 20, 2014.

s/Deborah Tofil
Case Manager